IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE ARDASH MARDEROSIAN TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | No. 12 C 6869 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| GOVERNOR PATRICK QUINN and | ) | |
| THE BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In 1992, after his wife Judy died, Ardash Marderosian created a music scholarship at the University of Illinois to honor her. The scholarship fund was established through the University of Illinois Foundation, a not-for-profit corporation ("Foundation"). Specifically, on November 11, 1992, Ardash and the Foundation entered into an agreement setting forth the specific conditions and criteria for awarding scholarship funds to promising University of Illinois music students. The complaint does not attach copy of the agreement, nor quote from or specifically describe its provisions. However, it does allege generally that the scholarship fund was "directed at music students who were the most like [Judy Marderosian], including students who pursued the same curricula as she had and had been raised in hard-working American families of limited means." Insofar as we know, the scholarship fund has been administered without problems for many years. The fund currently has an endowment of approximately $20,000 and is expected to award $846 in scholarship money for the year 2013.

In 2001, Ardash created a family trust for his benefit during his lifetime and then for the benefit on his three children when he died. The trust has a provision that $10,000 shall be donated to the scholarship fund when Ardash dies.

On May 1, 2012, Ardash died. Several months later, Ardash's daughter Catherine, acting as trustee, filed this lawsuit on behalf of the trust. The gist of the complaint is that when Ardash created the scholarship fund in 1992, he intended that the funds be only given to American citizens and that no funds should be given to a student who is an illegal alien. But the agreement fails to contain any provision explicitly embodying this alleged intention. The trust argues that the exclusion of illegal aliens is nevertheless an implied term of the 1992 agreement.

-1-

The trust filed this lawsuit because it is concerned that a student who is an illegal alien *may* one day be awarded scholarship funds in violation of this implied term. Even though this scenario has never happened since the fund was established in 1992, the trust believes that this possibility is more likely. Why? Because the Illinois General Assembly in 2003 passed a statute allowing students who are illegal aliens to receive lower in-state tuition if they meet certain requirements, such as attending a school in Illinois for at least three years and submitting an affidavit stating that they will apply to become a permanent resident of the U.S. at the earliest opportunity. *See* 110 ILCS § 305/7e-5. This statute, according to the trust, makes it easier for illegal aliens to attend the University of Illinois, which in turn increases the size of the potential applicant pool for the scholarship, thus raising the possibility down the road that a student who is an illegal alien eventually will receive scholarship funds in contravention of the intent of Ardash when he created the fund in 1992. The trust believes that the Illinois statute is in conflict with an earlier federal statute – specifically, 8 U.S.C. § 1623(a) (the "Illegal Immigration Reform and Immigrant Responsibility Act of 1996" ("IIRIRA")) – that prohibits a state from offering a post-secondary education benefit to illegal alien residents without also offering the benefit to residents of other states. The trust wants an injunction ordering the University of Illinois to stop offering reduced in-state tuition to students who are illegal aliens. It believes that if the Illinois statute is overturned, then these students will not be able to afford college, and then the scholarship funds will not be in danger of being given to such students.

The trust has named as defendants the Board of Trustees of the University of Illinois and Governor Patrick Quinn because they are responsible for setting in-state and out-of-state tuition rates for University of Illinois students. The complaint contains two counts. Count I seeks a permanent injunction ordering defendants to stop offering reduced in-state tuition to illegal aliens in order to comply with 8 U.S.C. § 1623(a). Count II is a claim for a declaratory judgment asking that this Court rule that the Illinois statute violates federal law.

Both defendants move to dismiss both claims under Rules 12(b)(1) and 12(b)(6). They assert several grounds for dismissal, but their primary argument is that the trust lacks Article III standing to challenge the Illinois statute because the trust has not suffered an actual injury since no illegal alien has been awarded any scholarship funds, nor is there any imminent danger of this happening. We agree and dismiss the complaint for lack of standing.

Both sides agree on the general principles of Article III standing. The Seventh Circuit recently summarized them as follows:

> The doctrine of standing instructs the court to determine if a litigant is entitled to a federal resolution of his grievance. To satisfy standing, (1) a plaintiff must have suffered an "injury in fact:" an invasion of a legally protected interest which is concrete and particularized, and actual and imminent; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely that the injury will be redressed by a favorable decision.

*Swanson v. City of Chetek*, 719 F.3d 780, 783 (7th Cir. 2013) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). It is the plaintiff's burden – here, the trust – to establish standing. *Abbott v. Lockheed Martin Corp.*, __ F.3d __, 2013 WL 4010226, *5 (7th Cir. Aug. 7, 2013).

At issue is whether the trust has suffered an injury in fact necessary to establish standing. The trust concedes that it has not suffered any current injury. (Pl. Resp. at 5.) It is undisputed that no illegal alien has ever been given scholarship money in the 20-year history of the fund or even in the nine years since the Illinois statute has been in existence. There is also no allegation that any current student who is an illegal alien is about to receive funds. Despite lacking any current injury, the trust maintains that it can meet the injury-in-fact requirement by showing that it faces an *increased risk* of future harm. (*Id.* at 6, *citing Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007).)

The parties argue over how plausible it is that the trust will suffer imminent harm. Defendants claim that the trust's theory "rests on a long series of speculations" about the effect of in-state tuition on the enrollment of illegal aliens and on the number of such students who might apply for the scholarship either with or without reduced tuition. (Bd. Mem. at 12-13.) The trust concedes that its case is built upon the factual claim "that illegal aliens cannot afford to pay *full* tuition rates to attend the University." (Pl. Resp. at 8.) But the trust argues that these are questions that can and should be fleshed out in discovery and not in ruling on a motion to dismiss.

We need not resolve these questions because we find that trust's claim of imminent injury fails for a separate and more fundamental reason. Its complaint rests on the assumption that the 1992 agreement contains a provision (albeit an implied term) preventing the Foundation from giving scholarship money to illegal aliens. However, as explained below, we conclude that the trust has not provided a plausible factual basis nor a viable legal theory to support this necessary assumption.

The trust makes a two-fold argument. It focuses first on intent. The trust alleges that in 1992 Ardash intended that the scholarship would be available "only to American citizens and/or legal aliens." (Cmplt. ¶¶ 13, 31.) The trust does not explain the basis for believing that Ardash had this intent 20 years ago when he entered into the agreement. Is there anything in writing evidencing his intent? Any witness who could testify about his state of mind in 1992? Moreover, a question arises as to why Ardash never bothered to file this lawsuit himself after the statute was passed in 2003. Nine years elapsed between the passage of the statute and his death; yet he never filed this lawsuit even though the same risk of injury existed in 2003 as it supposedly does now. This lawsuit was only filed after he died.

But proving intent is not really the biggest problem, as it is possible that Ardash's children or someone else could provide testimony regarding Ardash's intent, even going back to 1992. The second part of the argument requires the trust to show that this generalized intent was part of the agreement struck in 1992 with the Foundation. Did the Foundation agree to this

condition on the awarding of funds? The trust argues that it "is entitled to introduce extrinsic evidence about [Ardash's] intentions because there is no integration clause, and Ardash's understanding on this point is not inconsistent with any other term in the Agreement." (Pl. Resp. at 13.)

This argument misconstrues Illinois contract law. The First District Illinois Appellate Court recently summarized the law applicable to extrinsic evidence:

> When parties dispute the meaning of a contract provision, the initial question is whether the contract is ambiguous. *Hillenbrand v. Meyer Medical Group. S.C.,* 288 Ill.App.3d 871, 875-76, 224 Ill.Dec. 540, 682 N.E.2d 101 (1997). An ambiguity does not exist simply because the parties disagree as to the meaning of a contractual provision. *Id.* An ambiguity exists when the contractual provision contains language that is susceptible to more than one reasonable interpretation. *Id.* If, after review and consideration of the language of the agreement, a court determines that a provision is ambiguous the court will then look beyond the agreement to ascertain the intent of the parties. *Id.* If there is no ambiguity, parol evidence is not permitted to alter the contract. *Owens v. McDermott Will & Emery,* 316 Ill.App.3d 340, 349, 249 Ill.Dec. 303, 736 N.E.2d 145 (2000). Importantly, "[t]he contentions of the parties to [a] contract are not the criterion which should guide a court in determining whether the written contract is a full expression of the agreement of the parties. The court must determine this from the writing itself." *Castle, v. Powell,* 261 Ill.App. 132, 141 (1931). "If it imports on its face to be a complete expression of the whole agreement,— that is, contains such language as imports a complete legal obligation,— it is to be presumed that the parties introduced into it every material item and term, and parol evidence cannot be admitted to add another term to the agreement although the writing contains nothing on the particular term to which the parol evidence is directed." *Armstrong Paint & Varnish Works v. Continental Can Co.,* 301 Ill. 102, 106, 133 N.E. 711 (1922).

*Ringgold Capital IV, LLC v. Finley*, __ N.E.2d __, 2013 WL 3087238, *4 (Ill. App. Ct. June 19, 2013). As the above summary indicates, evidence of intent is relevant only if there is an ambiguity in the contract or if the agreement was not fully integrated. Here, the trust has not alleged any facts that could meet either condition. The trust has not pointed to any ambiguous provision that could arguably be interpreted as a requirement that only American citizens receive scholarship funds. Likewise, the trust has not argued that the 1992 agreement was in any way tentative or incomplete such that it would not be "a final and complete expression of the entire agreement." *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 878-79 (7th Cir. 2005) (quoting earlier Illinois cases). The trust does allege that the 1992 agreement lacks an integration clause. But the failure to include an explicit integration clause by itself does not prevent a court from holding that the agreement is fully integrated. *Id.* at 878 (concluding that a mortgage loan note was "a fully integrated document, despite the lack of a specific integration clause"); *Westchester Surplus Lines Ins. Co. v. Stonitsch Constr., Inc.*, 572 F.Supp.2d 946, 951 (N.D. Ill. 2008) ("A

contract need not contain an explicit integration clause to be fully integrated."). Aside from complaining about the lack of an integration clause, the trust has not alleged any other fact to suggest that the parties did not intend the 1992 agreement to be a complete expression of their agreement.

In sum, the trust has not come forward with a plausible basis for finding that the 1992 agreement contains an implied term excluding students who are illegal aliens. If there is no contractual right to prevent the Foundation from awarding funds to illegal aliens, then the trust by logical extension also has no legal basis for enjoining third parties from taking actions that might increase the chances that the Foundation would award funds to these students. In other words, you cannot enjoin third parties from aiding in the breach of a non-existent contract right.

On the other hand, let us suppose the trust could somehow surmount all these hurdles and establish that the 1992 agreement contains an implied prohibition on awarding funds to these types of students. If so, then the need for an injunction would evaporate. The trust would be protected by the 1992 agreement, and it would not matter how many illegal aliens attend the University nor how many of those students might then apply for the scholarship because, according to the 1992 agreement, none would be eligible for funds. Perhaps this explains why the Foundation has never awarded the funds to non-Americans in over 20 years. In any event, if and when the Foundation decides to award funds to a student who is an illegal alien, the trust could then sue the Foundation directly and try to prevent the transfer of funds based on a straightforward breach of contract theory. For all the above reasons, we dismiss the complaint for lacking of standing.

**ENTER:**

**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** September 25, 2013